**Opinion filed February 27, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00052-CR
_____

### IAN DANIEL MATHISON, Appellants

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**
**Palo Pinto County, Texas**
**Trial Court Cause No. 14636**

### M E M O R A N D U M   O P I N I O N

The jury convicted Ian Daniel Mathison of the offense of intentionally or knowingly causing serious bodily injury to a child, G.H. (Count One), and of the offense of intentionally or knowingly causing bodily injury to a child, C.H. (Count Two). The jury assessed punishment at confinement for twenty-two and one-half years for Count One and ten years for Count Two, and it assessed a fine of $10,000 in each count. The trial court sentenced him accordingly and ordered the sentences

to run concurrently. In his sole point of error on appeal, Appellant challenges the sufficiency of the evidence to support his conviction on Count One. We affirm.

*Background*

Gene Dunlap and her two sons, C.H. and G.H., lived with Appellant in Mineral Wells. C.H. was four years old, and G.H. was three years old. Dunlap left the boys at home with Appellant while she worked nights. When she returned home from work one morning, G.H. was lying on her bed, had a busted lip, and could not move his arm. Dunlap took G.H. to Weatherford Regional Medical Center while Appellant stayed with C.H.

The attending physician in the emergency room, Gerald Phillip Douglas, described G.H. as "bruised and battered all over" and said that he had not "seen anybody hurt this bad in a long time." His "initial impression was that somebody had used this child's face and head as a punching bag." Due to the nature of the injuries, a nurse reported abuse to the Mineral Wells Police Department. G.H. had a fractured humerus, so Dr. Douglas ordered a splint to stabilize the arm and transferred G.H. to Cook Children's Medical Center in Fort Worth.

When the attending physician, Daniel David Guzman, saw the significance of G.H.'s injuries, he called a "trauma alert." During such an alert, an anesthesiologist, a trauma surgeon, a radiologist, and laboratory services personnel respond immediately. G.H. had a broken jaw, a spiral fracture in his left upper arm, three broken fingers, and bruises from head to toe. G.H.'s eyes were swollen shut, and he had lacerations and bruising on his face and on the side of his head. Dr. Guzman was concerned about the bruises in G.H.'s lower pelvic area and abdomen because blunt force trauma there could have injured his spleen, liver, pancreas, or bowel and could cause him to "bleed out." After running tests, however, Dr. Guzman determined that there were no internal injuries in the abdominal cavity. The CT scan showed a nasal bone fracture, but G.H. did not

have intracranial bleeding or other head injuries. Doctors also determined that, due to a lack of swelling, the broken jaw was an old injury.

Dunlap told the doctors what Appellant had told her. According to Appellant, G.H. got out of bed to use the restroom, and when he saw a spider, he "freaked out." Appellant claimed that G.H. tripped over his blanket and landed with his arm "pinned up behind him." Dunlap initially blamed the various injuries on a fall that occurred while wrestling with C.H. Once they were at Cook Children's, however, Dunlap told the doctors that C.H. caused the bruises to one of G.H.'s eyes when C.H. stomped on G.H.'s face, and she also told doctors that G.H. hurt his chin and his lip when he fell on the sidewalk a few days before.

Detective Darby Thomas spoke with the treating physician in Weatherford, who told him that Dunlap's story appeared to be inconsistent with G.H.'s injuries because it was not plausible that the injuries were caused by a four-year-old. Detective Thomas went to Cook Children's to continue his investigation. The treating physician there, Dr. Guzman, believed that it was "non-accidental trauma," so he consulted with Dr. Jayme Coffman, who is a child abuse pediatrician and the medical director of the child abuse program at Cook Children's. Dr. Coffman believed that G.H.'s injuries were the result of abuse because "[t]he information the mom gave was not consistent at all with the injuries" she observed. Dr. Coffman described "horrible, horrible bruising and swelling to [G.H.'s] face" and a "horribly torn" frenulum, which is a piece of skin that connects the lip to the gums. Dr. Coffman said that, when she lifted G.H.'s lip, it looked like "hamburger meat" because there were "a lot of abrasions or lacerations inside his lip." Dr. Coffman explained that such injuries were the result of a blunt impact to the mouth and that the injuries were fresh because there was no evidence of healing.

Cook Children's personnel reported G.H.'s injuries to Child Protective Services. When Appellant heard that CPS was coming to his house to investigate,

he called and asked his friend Darryl Flint, who had been over playing video games the previous night, to come over and help clean the house. When he saw C.H., Flint noticed that he had two black eyes. Appellant said that C.H. ran into a doorknob. When Elizabeth Clement, the CPS investigator arrived and saw C.H.'s injuries, she obtained approval from her supervisor to take C.H. from the home and take him to Cook Children's. Clement testified that she had been an investigator with CPS for four years and that she had never done that before. CPS officials decided to begin removal proceedings. G.H. was hospitalized for three days, and both boys were placed with temporary foster parents and eventually were placed with Dunlap's brother and his wife.

Officers asked Appellant to come to the police station for questioning. Appellant's version of events contradicted the stories that police had already heard. As a result of that interview, Appellant was placed under arrest and searched prior to being booked into jail. The officer who searched Appellant noticed blood on Appellant's sock and seized the sock for testing. Officers executed a search warrant and took several items from the home, including a swab from a stain on G.H.'s mattress, a board that officers found in the trash, and a swab from blood that they found on the hallway floor. Lab results confirmed that the DNA profiles on each of these items, including Appellant's sock, matched G.H.'s DNA profile.

Once G.H. was discharged from the hospital, both boys were interviewed by Joy Hallum, a child forensic interviewer. Hallum endeavors to conduct neutral, non-biased, and non-leading interviews of children who may have suffered abuse. One of the ways that Hallum determines whether the child is telling a story from his own recollection or someone else's recollection is whether the child can describe sensory details such as what the child saw or heard, who was present, or how the child felt. C.H. told Hallum that Appellant spanked him with a board and a belt and that Appellant choked him with his hands and with a belt. C.H.

4

demonstrated how Appellant choked him. C.H. also said that he was "stomped on." C.H. said that G.H. hurt his arm while playing outside and that he had heard G.H. cry when Appellant punched G.H. in the face. G.H. was more timid, but Hallum said this was common for younger children. G.H. originally told Hallum that he hurt his arm while playing outside, but he eventually admitted that it happened when Appellant spanked him.

Dunlap was arrested and charged with injuring a child by omission for leaving the children with Appellant and knowing they were in danger of being injured, to which she pleaded guilty. Appellant was arrested and charged with two counts of causing serious bodily injury to a child. At Appellant's trial, the doctors could not testify that C.H.'s injuries constituted serious bodily injury, and the jury was asked to determine whether Appellant committed the lesser included offense of causing bodily injury to C.H.

*Issue*

Appellant challenges the sufficiency of the evidence on two grounds. First, he contends that the evidence is insufficient to show that "Appellant was the person who broke the arm of G.H." Next, Appellant argues that the evidence is insufficient to show that G.H. suffered serious bodily injury from the spiral fracture in his arm. Although Appellant states that the evidence is insufficient to show that "any of the injuries alleged as to either child amounted to serious bodily injury," we note that Appellant was convicted of causing only bodily injury to C.H. and that Appellant does not challenge the sufficiency of the evidence to support that conviction.

When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d

5

893, 912 (Tex. Crim. App. 2010). The jury is the sole judge of the credibility of the witnesses and is free to accept or reject any or all of a witness's testimony. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). We defer to the factfinder to resolve conflicting evidence, to weigh the evidence, and to draw reasonable inferences. *See Jackson*, 443 U.S. at 319.

*Identity*

Appellant first contends that "none of the witnesses could testify that Appellant caused the injury to G.H.'s arm" and that "no witness could testify as to how G.H. received the injury."

A person commits the offense of injury to a child, as it is relevant to this appeal, if he intentionally or knowingly causes serious bodily injury to a child. *See* TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2013). The State must prove beyond a reasonable doubt that the accused is the person who committed the charged offense. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984). Identity may be proven "by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

Dunlap testified that G.H.'s injuries were not there when she left for work the night before. Dunlap admitted that she knew Appellant was being "excessively rough" with the boys and that they were in danger of being injured by Appellant. Flint had witnessed Appellant shove and slap the boys as punishment and was at Appellant's house the night before G.H. was taken to the emergency room. Flint testified that when he saw C.H. the following day with two black eyes, marks, and bruises, he remembered wondering why Appellant was "doing this to these kids." Flint also told the jury that he had observed Appellant inflict "inappropriate" punishment on G.H. and C.H. by spanking them with a little 2x4 miniature baseball bat and that he thought Appellant had caused the boys' injuries.

6

In addition to showing that Appellant was the only adult in the home when G.H.'s arm was broken and that Appellant had inappropriately punished the boys in the past, the record reveals that the witnesses believed that Appellant's explanation of what happened was unlikely. Appellant said that G.H. slipped on a blanket and fell. Dr. Guzman diagnosed the injury as "non-accidental trauma." Likewise, Dr. Coffman testified that the injury was not consistent with an accident. She told the jury that G.H. "was covered in marks and bruises" and that "every part of his body had some sort of abrasion or bruise on it." Dr. Coffman said, "That doesn't happen from children playing rough. It doesn't happen from children fighting that are that young. It doesn't happen from falls. It doesn't happen from any of those things to have those numerous types of injuries." After seeing G.H.'s injuries, Detective Thomas said that his suspicion level was very high that a crime had been committed because the injuries did not "match up" with Appellant's story. After Dunlap learned that a spiral fracture is caused by twisting and applying torque to the arm, Appellant's explanation did not make sense to Dunlap, and she believed that Appellant "did it."

The jury can consider whether an explanation is plausible when determining whether the defendant caused the child's injuries. *Tezino v. State*, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (considering the implausibility that a four-month-old baby sat upright and fell into the dashboard, as urged by the defendant, when determining who caused the injuries). Considering the evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have determined that Appellant caused the spiral fracture to G.H.'s arm. *See Brooks*, 323 S.W.3d at 912.

*Serious Bodily Injury*

Appellant also complains that the evidence is insufficient to prove the element of serious bodily injury because G.H.'s broken arm "was the only injury

that the evidence showed might have possibly have been a serious bodily injury and the testimony of the physicians was inconsistent on that issue." Appellant argues that Dr. Guzman "would not say that G.H.'s injuries represented a substantial risk of death" whereas "Dr. Coffman testified that the only injury that she believe[d] qualified as serious bodily injury [was] G.H.'s fractured arm." The fact that the doctors' testimony may have conflicted does not render the evidence insufficient. It is not our role to resolve conflicts in the evidence, and we defer to the factfinder by considering the evidence in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 319.

The indictment alleged that Appellant caused serious bodily injury to G.H. in one of six ways, including "by twisting the arm of the said G.H. so as to cause a fracture." To show serious bodily injury in this case, the State had to prove beyond a reasonable doubt that G.H. suffered a protracted loss of the function of his arm or a protracted impairment of the function of his arm. *See* TEX. PENAL CODE ANN. § 1.07(a)(46) (West Supp. 2013). Neither protracted loss nor protracted impairment has been defined by the legislature, so we must apply its common meaning. One dictionary defines "protract" as to delay, defer, extend, or continue or to prolong in time or space. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1000 (11th ed. 2004).

There is no bright-line rule for determining whether an injury constitutes a protracted loss, but there must be evidence that the victim lost use of the limb or that the victim's function was impaired, as well as evidence of how long the use was lost or impaired. *See Black v. State*, 637 S.W.2d 923, 926 (Tex. Crim. App. [Panel Op.] 1982). In *Black*, there was evidence that the victim was shot in the leg, that he spent three days in the hospital recovering from surgery, and that "the leg took two to three months to heal," but the court held that the evidence was insufficient to prove serious bodily injury because there was no evidence that the

victim "had any loss of use of the limb." *Id.* The court noted that the State failed to offer hospital records or call any of the treating medical personnel and reasoned that "there is no evidence to indicate [the victim] was unable to walk after leaving the hospital or that he had suffered permanent damage to his thigh." *Id.* And, in *Villarreal v. State*, although there was evidence that the victim was not able to raise his arms or lift anything for ten days due to two fractured ribs, the court concluded that ten days did not constitute a protracted loss or impairment. 716 S.W.2d 651, 652 (Tex. App.—Corpus Christi 1986, no pet.).

Here, however, there is evidence that G.H.'s arm was immobilized for more than two months. Dr. Douglas testified that G.H. suffered "a spiral fracture of the midshaft of the humerus." A humerus fracture is immobilized to prevent movement; if not immobilized, the bone takes longer to heal and may not heal straight. Dr. Coffman agreed and explained that not immobilizing the limb "could cause shortening in the arm or other problems." To keep G.H.'s arm immobilized, it was splinted and placed in a sling. G.H.'s orthopedic doctor restricted G.H.'s activities and the use of his arm for "eight to nine weeks."

When the evidence is viewed in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that G.H.'s injury resulted in a protracted loss or impairment because the record shows that G.H.'s arm was immobilized for more than two months as a result of the injuries caused by Appellant. *See Williams v. State*, 575 S.W.2d 30, 33 (Tex. Crim. App. [Panel Op.] 1979) (holding "that the injury which caused [the victim] to lose lifting power in his arm for three months" constituted a protracted impairment of the function of a bodily member, so that "the wound would be classified as serious bodily injury").

*Conclusion*

Having concluded that a rational trier of fact could have found beyond a reasonable doubt that Appellant caused G.H.'s spiral fracture and that the injury constituted serious bodily injury, Appellant's sole point of error on appeal is overruled.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

JUSTICE


February 27, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.